# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8706 | **DATE** | 10/16/2002 |
| **CASE TITLE** | Kaplan vs. Premiere Radio Networks, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [8-1] is granted. Judgment entered in favor of defendant and against plaintiff. All future dates are stricken, including trial date of 5/19/03.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | OCT 17 2002 | date docketed | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. Mailed by MD. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | 10/16/2002 date mailed notice | |
| MD | courtroom deputy's initials | 02 OCT 16 PM 4:35 | | |
| | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JENNIFER KAPLAN,

    Plaintiff,

vs.

PREMIERE RADIO NETWORKS, INC.

    Defendant.

No. 01 C 8706

Judge Joan H. Lefkow

**DOCKETED**

OCT 1 7 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jennifer Kaplan ("Kaplan"), brings this law suit against defendant Premiere

Radio Networks, Inc. ("Premiere"), pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000(e) *et seq.*, alleging sexual harassment in Count I and retaliation in

Count II. Before the court is Premiere's motion for summary judgment. The court has

jurisdiction over the claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C § 2000e5-(f). For the

reasons set forth below, the court grants Premiere's motion for summary judgment.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The

party seeking summary judgment bears the initial burden of proving there is no genuine issue of

material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Premiere sells radio advertising time to companies and advertising agencies throughout the United States. (Def. L.R. 56.1 ¶ 1.) Kaplan was a Premiere employee and held the title of National Account Manager, or Account Executive.[1] (Pl. Resp. to Def. L.R. 56.1 ¶ 4.)

In September 2000, Premiere underwent a merger with AMFM Radio Networks ("AMFM"). (Def. L.R. 56.1 ¶ 15.) The resulting company retained Premiere's name. (Def. L.R. 56.1 ¶ 16.) Following the merger, Premiere's Chicago office was co-managed by Kenneth Walker ("Walker") and Daniel Smith ("Smith"). (Def. L.R. 56.1 ¶ 27.) Walker previously headed AMFM's Chicago office, while Smith was Kaplan's supervisor at Premiere. (Def. L.R. 56.1 ¶¶ 6, 20.) Walker and Smith both reported to Rhonda Munk ("Munk"), Premiere's Executive Vice President, who worked out of Dallas, Texas. (Def. L.R. 56.1 ¶¶ 25, 27.) Munk,

---

[1] Kaplan admits that she signed a form acknowledging receipt of Jacor's (then Premiere's parent company) Policy against Harassment. (Def. L.R. 56.1 ¶ 9.) Kaplan also signed a copy of Premiere's Policy on Sexual Harassment (Def. L.R. 56.1 ¶ 10; Def. Dep. Ex. 5.) Premiere's policy described the type of conduct prohibited and identified persons to whom aggrieved employees could report harassment. (Def. L.R. 56.1 ¶ 11.) The policy included the telephone number and e-mail address for the Corporate Human Resources Department and assured employees that they would not be retaliated against. (Def. L.R. 56.1 ¶ 12-13.)

2

Walker and Smith decided that Account Executives in the Chicago office would be assembled into two teams, one reporting to Smith and one reporting to Walker. (Def. L.R. 56.1 ¶ 28.) The Account Executives included Kaplan, David Boretti ("Boretti"), Lynn McAdams ("McAdams"), John Breen ("Breen") and Georgeann Leo ("Leo").

When Kaplan learned that a co-manager and team structure was being put in place, she told Smith that she wanted to continue to work for him and did not want to work for Walker because "his reputation preceded him." Kaplan believed that Walker had one or more extramarital affairs, had supposedly "been caught in a public library looking at pornographic magazines," and was "a very arrogant guy."[2] (Pl. Resp. to Def. L.R. 56.1 ¶ 29.) Smith and Walker recommended what teams Account Executives would be assigned to, subject to Munk's approval. (Def. L.R. 56.1 ¶ 31.) Effective January 1, 2001, Walker's team became Leo and Boretti, while Smith's team became Kaplan, McAdams, and Lindsay Wolkoff, a new Account Executive hired in January 2001. (Def. L.R. 56.1 ¶ 33.)

Because of the merger, Premiere's national sales force was effectively doubled. Rather than lay off any Account Executives, company president Kraig Kitchin decided that fewer accounts would be assigned to each Account Executive. (Def. L.R. 56.1 ¶ 26.) Similar to the decisions regarding team members, Smith and Walker decided what accounts each Account Executive would be assigned subject to Munk's approval. (Def. L.R. 56.1 ¶¶ 34-35.) Prior to the merger, Premiere territories that Kaplan was responsible for included Minnesota and Wisconsin,

---

[2]Kaplan's beliefs as to Walker's alleged extramarital affairs were not from personal knowledge but instead based on rumors she had heard when Walker was employed at another company. (Def. L.R. 56.1 ¶ 30.)

in addition to accounts and customers in Chicago. (Def. L.R. 56.1 ¶ 36.) Leo was responsible at AMFM for Minnesota but not Wisconsin.[3] (Def. L.R. 56.1 ¶ 39.)

After the merger, Smith and Walker recommended that Leo retain Minnesota and that Kaplan retain Wisconsin. (Def. L.R. 56.1 ¶ 41.) Munk approved this recommendation because she believed Leo had done a good job in Minnesota and had developed more new business there than Kaplan. (Def. L.R. 56.1 ¶ 42.) Indeed, Munk recruited Leo to AMFM because of Leo's experience. The year before the merger, Leo was awarded the Best in Syndication Sales Award at AMFM's annual sales meeting for doing the best job in selling AMFM's syndicated programs based on Munk's criteria. (Def. L.R. 56.1 ¶¶ 23, 24.) In addition to Wisconsin, however, Kaplan, along with McAdams, was assigned the Sears, Roebuck and Co. account, which was the biggest billing account in all of network radio. (Def. L.R. 56.1 ¶¶ 45-46.) Despite the territory and account changes, Premiere projected that Kaplan's income would be equal to or greater than her earnings in the previous year. (Def. L.R. 56.1 ¶ 49.)

At some unspecified point, Walker began having a sexual relationship with Leo. (Def. L.R. 56.1 ¶ 51; Pl. Resp. to Def. L.R. 56.1 ¶ 51.) According to Kaplan, Walker and Leo called each other on the telephone "all day" and Walker "would literally sit in [Leo's] office staring at her" making it difficult for Kaplan and other Account Executives to ask Walker questions or get his advice. (Def. L.R. 56.1 ¶ 54.) Also, Kaplan maintains that Walker and Leo would "disappear together for four hours at a time and no one had a clue where they were" and conversation in the office was dominated by discussion of their "affair." (Def. L.R. 56.1 ¶ 55; Pl. Resp. to Def. L.R.

---

[3]Leo had developed good business in Minnesota from Best Buy, Musicland, and Sam Goodie. (Def. L.R. 56.1 ¶ 40.)

4

56.1 ¶ 55.) The office relationship changed in February 2001, when Premiere transferred Leo to its New York City office as part of its expansion. (Def. L.R. 56.1 ¶¶ 57, 58.)

Despite Kaplan's earlier objections to working for Walker, in mid-March 2001 Kaplan was reassigned to Walker's team. (Def. L.R. 56.1 ¶ 64.) Smith and Walker collectively made the decision to reassign Kaplan to Walker's team, and Munk approved. (Pl. Resp. to Def. 56.1 ¶ 65.) Munk testified that the switch was made because Kaplan "would benefit by [Walker's] successful track record" and his "proven ability to coach and train a sales staff." (Id.) Smith called Kaplan to notify her of the change, explaining that she should report directly to Walker because Premiere thought she would do better on Walker's team because Kaplan and Smith were friends. (Def. L.R. 56.1 ¶ 66.) In addition, Smith told Kaplan that Walker "had pushed for [Kaplan] to be switched to [Walker's] team, that [Walker] welcomed the challenge of working with [Kaplan] and thought that [Walker] would be a good mentor for [Kaplan]." (Pl. L.R. 56.1 ¶ 104.)

According to Kaplan, the day after Smith's call, Walker came into Kaplan's office to discuss the reassignment. Kaplan described the conversation as follows:

> [Walker] acknowledged the fact that he knew I was unhappy about the decision that they had made to put me on his team. . . . But he said that he–everything was going to be okay. That I would flourish under his guidance and we would go to Wisconsin, we would build the territory, we would make overnight trips is what he said and would find new business and really work the territory well. And I can learn a lot from him.

(Def. L.R. 56.1 ¶ 68; Kaplan Dep. at 145-48.)

Kaplan interpreted Walker's comments as follows:

> Well, based on the prior events leading up to all this he had traveled with [Leo] to Minnesota, they had–I'm sure he thought she would flourish under his

guidance as well and clearly that again led to an extramarital affair that he was having with her while they traveled out of town.

And then he insisted that I switch to his team when [Leo] was transferred to New York for reasons we are unaware of at this point, and he insisted I switch to his team, that he thought I would flourish under him.

And again, just the suggestion that we go on overnight trips together led me to that conclusion.

(Pl. Resp. to Def. L.R. 56.1 ¶ 69; Kaplan Dep. at 148-49.)

On April 16, 2001, Munk terminated Walker for what she described as "lack of performance." (Def. L.R. 56.1 ¶ 75.) On May 17 or 18, 2001, more than one month after Walker's termination, Kaplan resigned from Premiere to take a job with Turner Broadcasting ("Turner") as an Account Executive doing essentially the same thing she did at Premiere. (Def. L.R. 56.1 ¶ 76.) At her exit interview with Barbara Fromer ("Fromer"), Director of Human Resources, Kaplan told Fromer that she was leaving Premiere for a better opportunity with Turner. (Def. L.R. 56.1 ¶ 77.) Kaplan did not mention any problems with Walker. (Def. L.R. 56.1 ¶ 78.)

## DISCUSSION

Kaplan claims that she was denied benefits and opportunities because she actively opposed Walker's affair with Leo. Kaplan also alleges that she was forced to resign because of her refusal to submit to Walker's sexually charged atmosphere.

In Count I, Kaplan claims that Walker's actions constitute unlawful sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. In Count II, Kaplan claims Walker's transfer of Kaplan's Minnesota accounts was in retaliation for

6

her express opposition to performing her responsibilities subject to the terms and conditions of employment which Walker imposed.

## A.    Count I: Sexual Harassment

Section 703(a) of Title VII forbids "an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000(e)-2(a)(1). In her complaint, Kaplan alleges that Premiere subjected her to *quid pro quo* and hostile work environment harassment. However, in *Burlington Indus.* v. *Ellerth*, 524 U.S. 742 (1998) and *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court abandoned these categories, "opting instead to distinguish between cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not." *Murray* v. *Chicago Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001), citing *Ellerth*, 524 U.S. at 760-65.

"The employer's liability in all kinds of cases is determined under agency principles, as the Supreme Court has enunciated them." *Molnar* v. *Booth*, 229 F.3d 593, 599-600 (7th Cir. 2000). Generally, employers bear vicarious liability for the harassment committed by a supervisor in accordance with the following rules as summarized in *Faragher*:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . No affirmative defense is available, however, when, the supervisor's harassment

7

culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. at 807-08. Thus, the court must determine whether the alleged harassment led to a tangible employment action. If so, Premiere would be liable without more; if not, Premiere would be entitled to assert affirmative defenses to any alleged hostile workplace, including: (1) that Premiere exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that Kaplan failed to take advantage of any preventive or corrective opportunities provided by Premiere to avoid harm. *Wolf* v. *Northwest Indiana Symphony Soc'y*, 250 F.3d 1136, 1142 (7th Cir. 2001), citing *Molnar*, 229 F.3d at 600.

1.     *Tangible Employment Action*

A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Kaplan makes two arguments for a tangible employment action: (1) she was "constructively discharged" due to Walker's actions and (2) the transfer of the Minnesota accounts to Leo.

i.     *Constructive Discharge*

The Seventh Circuit has not yet determined whether constructive discharge is a tangible employment action within the meaning of *Ellerth* and *Faragher*, *Wolf*, 250 F.3d at 1142, but as in *Wolf*, the court need not make this determination because Kaplan has not created a genuine issue of material fact that she was constructively discharged.

Constructive discharge refers to a situation "in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer

simply intolerable." *Lindale* v. *Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). As the Seventh Circuit has explained:

> To establish a claim of constructive discharge under Title VII, a plaintiff must prove that his working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation. Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress.

*Tutman* v. *WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).

Constructive discharge exists where there are "intolerable working conditions that involved a series of escalating sexual remarks culminating in a physical assault or death threat." *Simpson* v. *Borg-Warner*, 196 F.3d 873, 877 (7th Cir. 1999); *see, e.g., Taylor* v. *W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments and brandished a pistol and held it to one plaintiff's head); *Brooms* v. *Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir. 1989) (finding constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her).

Constructive discharge does not exist when plaintiffs are subject to less outrageous behavior. *See, e.g., Wolf*, 250 F.3d at 1142-42 (finding no constructive discharge where defendant made harassing comments to plaintiff and plaintiff complained only after he left); *Tutman*, 209 F.3d at 1050 (finding no constructive discharge where defendant made racist comments that plaintiff perceived as threatening); *Simpson*, 196 F.3d at 877-78 (finding no

constructive discharge when first threat against plaintiff was nonspecific and second threat was that "someone should take a dish and knock [plaintiff] upside the head."); *Drake* v. *Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886-87 (7th Cir. 1998) (finding work environment in which husband and wife plaintiffs were shunned, received harassing phone calls, discovered that someone had gone through their papers in their work locker and were told once that their safety might be in jeopardy "unpleasant" but tolerable).

Here, Kaplan claims that because she was the only female Account Executive on Walker's team and that because Walker "pushed" for her to be switched to her team, she had a strong basis for believing that she had to submit to Walker's sexual advances to succeed. Wanting to escape this "sexually-charged" environment, Kaplan claims that she was forced to seek a job at Turner, thus evidencing a constructive discharge.

Based on *Simpson*, *Taylor* and *Brooms*, however, this evidence is not enough to create an issue of fact that her job was so intolerable that a reasonable person would be compelled to resign. Kaplan's subjective belief that she would have to submit to Walker's sexual advances does not establish that a reasonable person would have felt compelled to choose between submission or resignation, or that the actions were otherwise intolerable. Insofar as the record stands, Walker at most made a suggestive remark to plaintiff. There is no evidence that she could not have said no should he have demanded more; nor can one infer from the Leo situation that Leo was involved with Walker against her will, from which one might infer that plaintiff also would have been required to submit or resign. Moreover, Kaplan did not leave Premiere and become "constructively discharged" until a month and a half after Walker was terminated from Premiere. Thus, whatever threat or discomfort Kaplan felt about Walker evaporated when he

left the company. Thus, Kaplan has not created a genuine issue of material fact as to constructive discharge.

### ii. Transfer of Accounts

Kaplan next claims that a tangible employment action took place when Premiere assigned her Minnesota accounts to Leo. Kaplan argues that Walker's relationship with Leo influenced the decision to assign Leo the Minnesota accounts.

Kaplan does not show how the transfer of the Minnesota accounts after the merger would be a "termination, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest* v. *Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001). After the merger Premiere decided to split up its accounts among Account Executives. Leo received the Minnesota account, which she worked on while at AMFM. In addition, Kaplan was given the Sears, Roebuck & Co. account and Premiere projected that she would make the same amount of money after the merger and shifting of accounts. Moreover, all Account Executives were subject to the same reshuffling of accounts. There was no termination, demotion, material loss of benefits, or diminished responsibilities. Therefore, the transfer of the Minnesota accounts does not constitute a tangible employment action.

### 2. Hostile Work Environment

To be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. The court must look at the totality of circumstances, including but not limited to the "frequency of the

11

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mosher* v. *Dollar Tree Stores*, 240 F.3d 662, 668 (7th Cir. 2001), citing *Fargher*, 524 U.S. at 787-87. In addition, "[i]nappropriate conduct that is inflicted regardless of sex is outside [Title VII's] ambit, and an employer cannot be held liable for creating or condoning a hostile work environment unless the hostility is motivated by gender." *Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001).

Kaplan argues that the workplace at Premiere was sexually hostile because the environment was "permeated" with Walker and Leo's affair and, moreover, that Walker's conduct implied that female employees under Walker's supervision had to submit to his sexual demands, which Kaplan claims is evidenced by the Minnesota accounts being transferred to Leo.

Kaplan's claims that the office was "permeated" with Walker and Leo's affair must fail because this conduct is not gender-based. *See Berry*, 260 F.3d at 808 ("[Title VII] is not a 'general civility code' designed to purge the workplace of all boorish or even harassing conduct."). All Account Executives, male or female, would have been affected by the alleged "relationship-dominated" conversations Kaplan alludes to. This is not sufficient to create a sexually hostile work environment.

With respect to Kaplan's contentions that Walker's conduct implied that female workers under Walker's supervision had to submit to Walker's sexual demands, the court concludes that Kaplan has brought forth merely a scintilla of evidence insufficient to withstand summary judgment. Although Kaplan's evidence establishes her own subjective beliefs regarding Walker's conduct, she has not brought forth evidence to create an issue of fact that the workplace

12

was so objectively offensive that a reasonable person would have found it hostile or abusive. The conduct Kaplan complains of centers around Walker's affair with an employee he supervised, that employee receiving accounts that formerly belonged to Kaplan, Walker's "pushing" to get Kaplan to work for his team, and one alleged statement Walker made referencing "overnight trips." This conduct is not "severe" or physically threatening or humiliating. Kaplan's evidence does not create a genuine issue of material fact that a reasonable person would have found the workplace sexually hostile or abusive. Therefore, Kaplan's claim of a hostile work environment cannot be sustained.[4]

Because no genuine issue of material fact exists as to whether a tangible employment action was taken or that a hostile work environment existed, summary judgment as to Count I is granted in Premiere's favor.

## B.   Count II: Retaliation

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing." 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). When an employee attempts to prove retaliation using the indirect method of proof, as Kaplan does, to establish a *prima facie* case, the employee must demonstrate that:

> (1) she engaged in statutorily protected activity; (2) she performed her job
> according to her employer's legitimate expectations; (3) despite meeting her

---

[4]Because the court concludes that the work environment was not hostile or abusive, it does address Premiere's affirmative defenses under *Ellerth*.

13

employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

*Id.* If an employee succeeds in proving her *prima facie* case, the burden falls on the employer to offer legitimate and noninvidious reasons for the adverse employment action. *Id.* After the employer has done so, the burden of production shifts back to the plaintiff to demonstrate the pretextual nature of the proffered reason. *Id.*

Kaplan claims that her protected expressions were her statements to Smith regarding Walker's "reputation" and rumors concerning Walker's past, her opposition to Walker's preferential treatment of Leo and the sexually charged atmosphere. Even if Kaplan could establish that her conduct was protected activity,[5] the court has already concluded that Kaplan suffered no adverse employment action. Thus she cannot prevail on this claim.[6]

## CONCLUSION

For the reasons stated above, the court grants Premiere's motion for summary judgment [#8]. The clerk is instructed to enter judgment in favor of the defendant and against the plaintiff.

Dated: October 16, 2002                  ENTER: _Joan H. Lefkow_
                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge

---

[5]Whether Kaplan engaged in protected expression under Title VII is certainly questionable, as Kaplan's expression do not concern perceived harassment or discrimination. The statements that Kaplan refers to were limited to Kaplan telling Smith that she did not wish to work for Walker because of rumors she had heard. She made no mention of Leo or any purported preferential treatment. Kaplan further never complained to Smith about the so-called "sexually-charged work atmosphere."

[6]Moreover, Kaplan does not show how she was treated differently from other employees. Instead, the evidence establishes that all Account Executives had accounts reshuffled as a result of the merger. All of the Account Executives also presumably observed Walker's affair with Leo. In short, Kaplan has not created a genuine issue of fact that she was treated differently from other employees. Therefore, her retaliation claim must fail, and summary judgment as to Count II is granted in Premiere's favor.

14